UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JONATHAN MICHAEL BURTON,

            Plaintiff,

v.                                                              Case No. 3:23-cv-1195-BJD-SJH

OFFICER G. SMITH, et al.,

            Defendants.

_____

## <u>ORDER</u>

**THIS CAUSE** is before the Court on Defendants' Motion for Summary

Judgment (Doc. 65) and Plaintiff's Opposition (Doc. 69) thereto.

### I.    Status and Allegations

Plaintiff Jonathan Michael Burton, an inmate of the Florida penal

system, is proceeding on a pro se Complaint for violation of civil rights under

42 U.S.C. § 1983 against Officer G. Smith, Sergeant D. Mitchell, and Sergeant

E. Prock, in their individual capacities.[1] Doc. 1. Plaintiff alleges that on April

21, 2020, while housed at Florida State Prison ("FSP"), he refused to leave the

doctor's office and had to be carried down the hallway. *Id.* at 5. At some point

after Plaintiff began to walk normally, Smith and Mitchell became upset and

_____

[1] The Court previously dismissed Plaintiff's official-capacity claims against
Defendants. *See* Doc. 18.

pushed Plaintiff's wrists against the restraints by forcing his arms upwards, then forced him into his cell, and attacked him without justification. *Id.* at 5–6. Plaintiff alleges that Smith and Mitchell punched and stomped on him while he was still in full restraints, and Smith hit Plaintiff's head with his radio, "bust[ing] [his] head." *Id.* at 6. After this altercation, Prock and other officers had to escort Plaintiff back to the doctor's office. *Id.* At that point, Plaintiff was "very upset" because of the beating and "tried to step to the officer." *Id.* After Plaintiff returned to his cell, Prock allegedly put his finger in Plaintiff's buttocks. *Id.* Based on these events, Plaintiff alleges that Defendants violated his Eighth Amendment rights: Smith and Mitchell – through their excessive use of physical force, and Prock – through his commission of a sexual act. *Id.* at 7. Plaintiff seeks compensatory and punitive damages.[2] *Id.*

Defendants move for summary judgment in their favor, arguing that: (1) the undisputed material facts establish no constitutional violation; and (2) Defendants are entitled to qualified immunity. *See* Doc. 65 at 1, 7–20. Plaintiff responds there are factual disputes that preclude entry of summary judgment.[3] *See generally* Doc. 69.

---

[2] Plaintiff amended his injury and damages allegations on January 3, 2025. *See* Docs. 21, 22.

[3] The Court advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for

## II.   Summary of the Evidence

### A.   Defendants' Evidence

In support of their Motion, Defendants provide the following exhibits: (1) Plaintiff's deposition transcript, Doc. 65-1; (2) the incident report with attachments, Doc. 65-2; and (3) eight videos from the date of the incident, Doc. 66. *See* Doc. 65-3.

### 1.   Plaintiff's Deposition

At his deposition, Plaintiff described the April 21, 2020 incident as "[e]xcessive use of force without justification while in full restraints." Doc. 65-1 at 9. On the day of the incident, Plaintiff was ordered to leave the mental health room, but he refused because he "needed medication." *Id.* at 9–10. Ultimately, Plaintiff had to be carried away by Mitchell and Smith because he "was refusing to walk down the main hallway." *Id.* at 10. When they reached Bravo wing, Plaintiff "began to walk regularly," but the officers continued the "custodial hold," causing him wrist and nerve pain. *Id.* at 11–14. When they reached Plaintiff's cell, Plaintiff did not enter, but rather "leaned up against

---

summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to such motions. *See* Doc. 7.

the wall to get the restraints taken off." *Id.* at 13–15. Plaintiff testified he "didn't grab the door frame" while standing outside the cell. *Id.* at 16.

Plaintiff "was pushed in the cell," while still "in cuffs."[4] *Id.* at 15, 17, 21–22. At that time, Mitchell and Smith were punching Plaintiff "from both directions." *Id.* at 22. Smith hit Plaintiff's head with the radio, causing bleeding. *Id.* Mitchell grabbed Plaintiff's left ring finger and "snapped it . . . to the left." *Id.* at 22–23. The officers were in Plaintiff's cell for fourteen seconds. *Id.* at 21. Then, "they backed out"—Mitchell first, Smith second. *Id.* at 23.

After the officers left the cell, they came back with a hand-held camera. *Id.* At that point, Plaintiff was "very, very upset, [and] hostile because [he had] just been beaten in full restraints." *Id.* While Plaintiff was still in full restraints, Defendants attempted to take him to medical for examination of his injuries, but Plaintiff "was mad" and "tried to step on" the officer, which was unsuccessful because Officer Carlos Posada applied "a custodial touch" on Plaintiff. *Id.* at 23–25. Because of Plaintiff's attempt to "head butt" the officer,

---

[4] According to Plaintiff, it was against "policy" to direct him to enter the cell "in cuffs." Doc. 65-1 at 17.

Plaintiff "never made it to medical." *Id.* at 24.[5] Instead, he was escorted back to his cell by Prock and Posada. *Id.*

Once inside the cell, Plaintiff kneeled on his bed so the officers could "take the shackles off," but they decided to let him lay down because he was "upset." *Id.* at 26. Plaintiff was laying on his hands. *Id.* at 27. Posada was positioned near his head, Gustafson was near his feet, and Prock was in the middle. *Id.* Then, pursuant to an informal FSP policy, the captain tapped Prock on the shoulder, which was a signal to make Plaintiff move by sticking a finger in his butt so the officers could then use force on Plaintiff under the pretext that he resisted. *Id.* at 27–28. Unaware of the signal, Gustafson had already removed Plaintiff's shackles. *Id.* at 28–29. Prock then gave Gustafson a signal to block the camera with his body so that Prock could touch Plaintiff outside the camera's view. *Id.* at 29. To that end, Gustafson put his knee over Plaintiff's ankles. *Id.* Plaintiff yelled: "Hey, man, why [do] you keep putting your hand in my ass?" *Id.* Plaintiff alleges that some unidentified parts of the audio recording were removed. *Id.*

---

[5] At some point, nurse Kayla Cribb documented Plaintiff's injuries at cell front. Doc. 65-1 at 31–32.

At some point after Plaintiff was taken to medical, he "head butted" an officer, resulting in another use of force against him. *Id.* at 39. At that time, Officer Patrick Williams snapped Plaintiff's right index finger. *Id.* at 40. According to Plaintiff, all his hand X-rays were falsified to avoid liability. *Id.* at 33–36, 38.

## 2. Video Evidence[6]

The video evidence shows that at around 2:31 p.m., Plaintiff was removed from the mental health room and carried by two officers on each side, with several others following, from the second to the third floor. *See* Videos 1, 2. At around 2:32 p.m., the group reached Plaintiff's cell. *See* Videos 3, 4. When Plaintiff refused to enter, the officers started pushing him rugby-style into the cell.[7] *See id.* Within ten seconds of entering, at 2:32:54 p.m., the officers started

---

[6] Defendants provide the following eight videos from the date of the incident: (1) B-wing, second floor, Q deck, left side video of 1:14 minutes starting at 2:30 p.m. ("Video 1"); (2) B-wing, second-to-third-floor stairwell video of 52 seconds starting at 2:30 p.m. ("Video 2"); (3) B-wing, third floor, front-camera video of 9:57 minutes starting at 2:30 p.m. ("Video 3"); (4) B-wing, third floor, rear-camera video of 9:59 minutes starting at 2:30 p.m. ("Video 4"); (5) B-wing, second-to-third-floor stairwell video of 1:23 minutes starting at 2:40 p.m. ("Video 5"); (6) B-wing, second floor, Q deck, left-side video of 2:11 minutes starting at 2:40 p.m. ("Video 6"); (7) B-wing, third floor, front-camera video of 7:36 minutes starting at 2:42 p.m. ("Video 7"); and (8) main hand-held video of 22:44 minutes starting at 2:35 p.m. ("Video 8"). *See* Docs. 65-3, 66.

[7] It took about seventeen seconds from the time they reached Plaintiff's cell (2:32:27 p.m.) to the time they entered it (2:32:44 p.m.). *See* Videos 3, 4.

exiting Plaintiff's cell one by one, and by 2:33:00 p.m., they were all out. *See id.* There is no video footage of what happened inside the cell during the ten seconds that the officers were inside.

At 2:35 p.m., Officer Cortez appeared at the scene and started recording with a hand-held camera. *See* Video 8. He stated that Smith and Mitchell had just used reactionary force on Plaintiff. *See id.* At around 2:37 p.m., the officers opened Plaintiff's door, he stepped outside still in restraints, and leaned on the outside wall with his back to the officers. *See id.* At 2:38 p.m., a nurse approached Plaintiff and the group of officers standing near him. *See* Videos 3, 4. When the nurse tried to examine Plaintiff, he appeared uncooperative and talked back at her and the officers. *See* Video 8. The nurse recorded something in her notes and left at around 2:40 p.m. *See* Videos 3, 4, 5. Plaintiff and the officers started walking behind her. *See id.* Plaintiff was loud and belligerent. *See* Video 8. The group walked down the stairs to the second floor where Plaintiff entered a room and came back a minute later. *See* Videos 5, 6. The group headed back to the third floor at 2:42 p.m. *See* Videos 6, 7, 8.

At 2:43 p.m., Plaintiff entered his cell with three officers—Posada, Prock, and Gustafson—while the rest of the group remained outside. *See* Videos 7, 8. Plaintiff kneeled on his bed for removal of the restraints. *See* Video 8. Plaintiff refused to lean his head on the wall, yelling something incoherent. *See id.* At

7

that point, the female captain, who could be heard giving orders from behind, entered the camera's view and continued giving orders. *See id.* The officers placed Plaintiff on his stomach while continuing to hold his body down. *See id.* With his knee on Plaintiff's ankles, Gustafson started removing Plaintiff's shackles. *See id.* Meanwhile, the captain was observing the scene and tapping the officers on their backs. *See id.* While Gustafson was still holding Plaintiff's legs and was blocking the camera with his body, Prock made a motion with his hand while removing the chain from Plaintiff's waist. *See id.* Plaintiff yelled: "What the f*** you keep putting your hand by my ass for?" *Id.* Immediately, the captain responded: "He is not putting his hand there." *Id.* At that moment, several officers yelled at Gustafson to move his body for an unobstructed view of the scene. *See id.* When Prock was finished removing the chain, the officers told Plaintiff to keep his face down. *See id.* Plaintiff was still on his bed when the captain ordered the officers to "back out" one at a time, in a chain pattern. *Id.* The operator announced the time was 2:44 p.m. *See id.* Within two minutes of entering, all officers had exited Plaintiff's cell. *See* Video 7.

After the officers closed Plaintiff's door, he placed his hands out in the door slid and his handcuffs were removed. *See* Video 8. At 2:45 p.m., Plaintiff started extending his hands one at a time—first his right hand, then his left hand—through the door slid. *See id.* Then, he started wrapping a white shirt

around the door flap, making knots and showing good dexterity and no obvious sign of impairment in his hands or fingers. *See id.* While Plaintiff was doing all of that, he was yelling profanities and complaining about what the officers had done to him. *See id.* The recording ended a few minutes later, at 2:57 p.m. *See id.*

### 3.    Incident Report Attachments

In a statement attached to the incident report, Plaintiff states that after the officers escorted him from the mental health room to his cell and opened his cell door, he "was standing still" because he was waiting for them to remove his restraints. Doc. 65-2 at 2. When Plaintiff realized that was not happening, he "attempted to grab the door frame [because he knew] they [were] going to commit felony battery inside the cell." *Id.* Plaintiff also states that when the officers pushed him inside the cell, Mitchell hit him eight times, Smith hit him twelve times, and Sergeant Gary Keegan punched him with handcuffs twice, which "bust[ed] [his] head open." *See id.*

A post-use-of-force examination of Plaintiff on April 21, 2020 at cell front showed a knot on the left side and a minor scratch on the right side of his head. *See id.* at 3. Plaintiff could not be pulled out of his cell for further assessment because he was belligerent. *See id.* Another post-use-of-force examination from

the same date showed a 1.5 cm laceration on the left side of his head and an

abrasion on his middle and ring fingers. *See id.* at 5.

### B.    Plaintiff's Evidence

Plaintiff submits his declaration, Doc. 69 at 19–20, his "general

affidavit," Doc. 69-1 at 37–38, and multiple exhibits, Doc. 69-1.[8]

### 1.    Plaintiff's Declaration and Affidavit

In his declaration, Plaintiff avers:

> I . . . was escorted by force for refusing to leave a [mental health]
> meeting[.] [U]pon enter[ing] my housing wing (Bravo)[,] I became
> compliant with all orders[.] [O]fficers Mitchell [and] Smith had a
> grip on me that hurt my wrist and damaged my nerves in my
> arms/wrist[s.] [T]his nerve damage has been going on for five
> years[.] [H]owever[,] I walked up the stairs to the third floor in
> compliance[.] I also walked down the hallway in compliance[.]
> Smith was the aggress[o]r and was upset I made them carry me
> down the hallway[,] and chose to punish me for my . . . past
> misconduct by pushing me for not walking down the walkway[.]
> Smith pushed me into my housing cell with the force of a
> madman[.] [Smith] and Mitchell started punching me[.] [T]hey
> both kicked me twice or better[,] then Smith hit me with his radio
> twice[,] and Mitchell grab[bed] my left ring finger and snapped it
> to the left[.] [W]hen Smith hit me[,] my head bust[ed] wide open
> [and] blood was everywhere on the left side[.] [T]hey backed out[.]
> [T]he entire time[,] I was in full restraints and did not resist or
> refuse any orders.

---

[8] To the extent Plaintiff's exhibits are duplicative to Defendants' exhibits or irrelevant to the issues on summary judgment, the Court does not address them. *See* Doc. 69-1 at 12, 15, 22–27, 40–101. For example, some of Plaintiff's medical records pertain to injuries unrelated to the April 21, 2020 incident. *See id.* at 12, 15, 22–27.

. . . [I] was being escorted by E. Prock to medical due to me being physically beaten by Mitchell [and] Smith[.] [U]pon approaching the second floor where the front door to exit is[,] a[n] officer laughed at my head bleeding[.] I tried to head butt him and was taken back to my housing cell[.] [T]he supervisor told the officers to take the full set of restraints off [at] cell front as the procedure was . . . but another supervisor told him to take me into my cell. I refused to put my head against the wall because my head was bust wide open[.] Prock told me to lay face down to take the "red lock and waist chain" off at this time[.] [T]he officer took off my leg irons and put his leg over my ankles[.] Prock was blocked by the officer so the camera did not see Prock place his finger in my buttocks[.] Prock's finger went in my ass crack [and] entered my ass cheeks (not my hole) because his finger was to[o] big to fit but Prock . . . slightly penetrated my anus[.] No injuries [were] documented because I was scared and yelled for Prock to get his finger out my ass[.] [T]he sexual assault is de minimis in nature but emotionally I['] m damaged[.] [I am] a heterosexual male who never got into the homosexual acts in prison and this has made my mind shocked[.] I did not think Prock was doing this even though I heard how he has a long history of this until I became a victim[.] [H]e is a very hurtful person[.] I had to tell.

Doc. 69 at 19–20. Plaintiff's "general affidavit" matches the averments in his declaration. *See* Doc. 69-1 at 37–38.

## 2.    Plaintiff's Medical Records

Plaintiff's emergency room records from April 21, 2020 show that he had laceration with minimal bleeding on the left side of his head and abrasions on his ring and middle fingers. Doc. 69-1 at 7–10. Plaintiff's treatment records from June 29, 2022 show that no treatment was indicated for his fingers despite previous "fractures with very mild deformity." *Id.* at 17.

11

On April 27, 2020, Plaintiff's left-hand X-ray showed no evidence of acute osseous injury. *Id.* at 11. On October 30, 2020, his left-hand X-ray showed no evidence of fracture. *Id.* at 16. On May 16, 2023, his left-hand X-ray showed no fracture or dislocation. *Id.* at 18. On December 15, 2023, his left-hand X-ray showed no gross osseous abnormality and noted that fracture was not excluded. *Id.* at 19. On March 8, 2024, his left-hand X-ray showed no acute osseous abnormality. *Id.* at 21.

## III.   Summary Judgment Standard

Under the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Kesinger v.*

12

*Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. *Id.* Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." *Haves v. Miami*, 52 F.3d

918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. Discussion[9]

It is well understood that prison guards, who are charged with maintaining order and security, may use force when necessary. *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986); *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991). However, the Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." *Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987). As such, gratuitous beatings, even those that do not cause serious injury, violate the Eighth Amendment's proscription against cruel and unusual punishments. *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). The Supreme Court has held, "The 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied

---

[9] As previously noted, for purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proven.

14

in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* at 37 (internal punctuation omitted).

When an officer uses force to restore order or maintain security, whether that force can be classified as "excessive" requires courts to consider various factors, including the need for force, the extent of force used in relation to the prisoner's conduct, the threat of harm the prisoner posed to staff and inmates, whether the officer tried to "temper the severity of a forceful response," and the injuries inflicted. *See Williams*, 943 F.2d at 1575; *Whitley*, 475 U.S. at 321 ("*Whitley* factors"); *see also Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002). When considering these factors, the courts must "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007) (citation omitted).

Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). De minimis uses of physical force are excluded from constitutional recognition provided they are "not of a sort repugnant to the conscience of mankind." *Id.* at 9–10. "Although the extent of the injury is a relevant factor in determining the amount of force applied, it is not solely determinative of an Eighth Amendment claim."

*Muhammad v. Sapp*, 494 F. App'x 953, 957 (11th Cir. 2012)[10] (citing *Wilkins*, 559 U.S. at 37). "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38. "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" *Stallworth v. Tyson*, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987)).

## A.    The First Incident – Handcuffs

Plaintiff alleges that while he was being escorted from the mental health room to his cell, the officers pushed his wrists against his handcuffs by forcing his arms upwards even after Plaintiff had begun walking on his own, and this unnecessary "custodial hold" caused him wrist and nerve pain. *See* Doc. 1 at 5–

---

[10] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. *See McNamara v. GEICO*, 30 F.4th 1055, 1060–61 (11th Cir. 2022); *see generally* Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

6; Doc. 65-1 at 9–14; Doc. 69 at 19. Plaintiff argues that the "custodial grip" should have ended the moment he started walking on his own. Doc. 69 at 7, 13.

Affording Defendants a wide range of deference in preserving discipline and security, the Court finds the *Whitley* factors balance in Defendants' favor. First, considering the undisputed evidence that Plaintiff refused to leave the mental health room, Defendants reasonably perceived the need to use force to carry him from the second to the third floor when he was dragging his feet, and then to keep him in a "custodial grip" after he started walking. Doc. 1 at 5; Doc. 65-1 at 9–10; Doc. 69 at 19. Plaintiff asserts that the "custodial grip" should have ended the moment he started walking, but his story conflicts as to when that moment began. Doc. 69 at 7, 13. In his Complaint and at his deposition, Plaintiff claims he "began to walk regularly" when they reached Bravo wing. Doc. 1 at 5–6, Doc. 65-1 at 11–14. However, in his declaration, Plaintiff claims he "walked up the stairs to the third floor in compliance." Doc. 69 at 19. Regardless of this inconsistency, the videos show that the entire walk took only a minute. Under the circumstances, the Court must give Defendants deference in deciding how to safely escort Plaintiff to his cell, considering his very recent and undisputed non-compliance with the officers' orders and the potential risks to the safety of staff and inmates if Plaintiff were given an opportunity to withdraw his compliance. And although the video evidence does not show a

17

close-up of the parties' movements, it reveals a calm, organized, and professional effort to escort Plaintiff back to his cell without any indication that the officers applied force maliciously and sadistically to cause harm. *See* Videos 1, 2, 3, 4. Additionally, the medical records submitted by the parties do not indicate any complaints, diagnoses, or treatment plans pertaining to any wrist and/or nerve pain. Even assuming Plaintiff suffered such pain, the pain does not necessarily indicate that Defendants' force was excessive. Thus, there is no genuine issue of material fact about Defendants' use of force during the first incident.

## B.    The Second Incident – Forced Into Cell

Plaintiff alleges that he was forced inside his cell and attacked without justification while he was still fully restrained. Doc. 1 at 5–6. Specifically, he alleges that Smith and Mitchell punched and stomped on him, and Smith also hit him with his radio "bust[ing]" his head. *Id.* at 6.

Again, affording Defendants a wide range of deference in preserving discipline and security, the Court finds the *Whitley* factors generally balance in Defendants' favor. First, Defendants reasonably perceived the need to use force when Plaintiff refused to enter his cell. To the extent Plaintiff's account of this incident is somewhat inconsistent, the "Court will accept the video's depiction over [Plaintiff's] account of the facts [because] the video obviously

18

contradicts [his] version of the facts." *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (citations omitted); *see also Perez v. Suszczynski*, 809 F.3d 1213, 1221 (11th Cir. 2016) ("[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (quotations and citation omitted)); *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) ("[W]hen the non-movant's assertion is 'so utterly discredited' by the record, no 'genuine' dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant." (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007))).[11] Specifically, the video evidence shows that when Plaintiff reached his cell, he refused to enter, prompting the officers to start a series of rugby-style pushes for the next seventeen seconds until they were finally able to push Plaintiff inside the cell. *See* Videos 3, 4. In resisting the officers, Plaintiff was holding onto something, which explains why he was able to resist them for as long as he did.[12]

---

[11] To the extent there are other inconsistencies between the video evidence and Plaintiff's averments, the Court accepts the facts as demonstrated in the videos.

[12] In a statement attached to the incident report, Plaintiff admits that he "attempted to grab the door frame," Doc. 65-2 at 2, but he later tried to retract his statement by saying that he was describing another incident. *See* Doc. 65-2 at 2; Doc. 69 at 14. Also, at his deposition, Plaintiff stated that he "didn't grab the door frame" but only "leaned up against the wall to get the restraints taken off." Doc. 65-1 at 13–

Second, the relationship between the need and the amount of force used to push Plaintiff inside his cell also weighs in Defendants' favor. Third, Plaintiff does not allege that he suffered any injury from Defendants' pushes. Fourth, considering Plaintiff's resistance, the extent of the threat to the safety of staff and inmates also appears to weigh in Defendants' favor. And finally, the officers acted reasonably when they used rugby-style pushes to move Plaintiff into his cell.

Plaintiff asserts that once he was inside the cell and subdued, the officers improperly used gratuitous force on him. Doc. 69 at 14–15. He explains that the video evidence provides only a chronology of the events, but fails to capture Defendants' reactionary use of force and their specific interactions with Plaintiff. *Id.* at 15. Plaintiff is correct that there is no direct video footage of the officers' actions inside Plaintiff's cell during the second incident. Nevertheless, based on the evidence that is before the Court and the wide range of deference that Defendants are afforded in preserving discipline and security, the Court does not find that Defendants used force maliciously and sadistically.

---

16. However, Plaintiff's claim that he was just standing near his cell and waiting for his restraints to be removed is unsupported by the videos. *See* Videos 3, 4.

20

First, Defendants reasonably perceived the need to use force when Plaintiff refused to enter his cell. The video evidence corroborates Defendants' position that Plaintiff resisted them and negates Plaintiff's position that he was punished for his past behavior. Second, it is unclear whether the relationship between the need and the amount of force used by Defendants inside the cell favors either party. However, it is undisputed that Defendants did not stay in the cell for more than ten to fourteen seconds. *See* Videos 3, 4 (showing that at 2:32:54 p.m., or ten seconds after entering, the officers started exiting the cell); Doc. 65-1 at 21 (conceding that the officers were inside Plaintiff's cell for no more than fourteen seconds). In such a short amount of time, it is implausible that the officers would manage to hit, kick, or punch Plaintiff as many times as he claims. *See* Doc. 65-2 at 2 (claiming that Mitchell hit Plaintiff eight times, Smith hit him twelve times, and Sergeant Gary Keegan punched him with handcuffs twice in the head). Additionally, Plaintiff's account of how he received his injuries varies. For example, while Plaintiff generally alleges that Smith hit him with the radio and "bust[ed] [his] head," Doc. 1 at 6, Doc. 65-1 at 22, Doc. 69 at 19, he also states that Sergeant Keegan, a non-party, punched him with handcuffs and "bust[ed] [his] head open," Doc. 65-2 at 2.

21

Therefore, considering the inconsistencies in Plaintiff's recollection of the events, his resistance to the officers, his combative behavior, and the short amount of time that Defendants spent inside the cell, the Court finds it implausible that Defendants used gratuitous force against Plaintiff.[13] In reaching this conclusion, the Court also considers the extent of Plaintiff's injuries—laceration with minimal bleeding on the left side of his head and abrasions on his ring and middle fingers. *See* Doc. 69-1 at 7–10. These injuries are consistent with getting a combative inmate to comply with orders and are not necessarily indicative of use of excessive force. Further, considering Plaintiff's resistance, it is possible that the extent of the threat to the safety of staff and inmates weighs in Defendants' favor. But, in the absence of specific evidence, the Court finds the last two *Whitley* factors neutral.

"Although [the Court] cannot pinpoint with precision the amount of force used" by Defendants, the fact that "some amount of force was justified" to overcome Plaintiff's resistance, that Plaintiff provides an inconsistent account of the events, and that his injuries (except perhaps his head injury) were de

---

[13] Again, the officers' conduct outside the cell was professional, calm, and organized, whereas Plaintiff was combative, loud, and belligerent at times. *See* Video 8. Plaintiff was uncooperative even with the nurse who attempted to examine and record his post-use-of-force injuries. *See id.*; *see also* Doc. 65-2 at 3 (noting that Plaintiff could not be pulled out of his cell for further medical assessment because he was belligerent).

minimis, persuades the Court that "the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a reliable inference of wantonness in the infliction of pain.'" *Brown*, 813 F.2d at 1189–90 (quoting *Whitley*, 475 U.S. at 322). Thus, the Court will grant Defendants' Motion with respect to Plaintiff's claims of excessive use of force.

### C.    The Third Incident – Sexual Assault

The final incident concerns an allegation of sexual assault against Prock after Plaintiff was removed from his cell for a medical evaluation, but then returned to his cell because he attempted to "head butt" an officer on the way. Doc. 1 at 6; Doc. 65-1 at 23–25. Plaintiff alleges that while he was lying face down on his bed and the officers were removing his restraints, Prock put his finger in Plaintiff's buttocks. Doc. 1 at 6; Doc. 65-1 at 23–25; Doc. 69-1 at 37–38. Plaintiff describes the sexual assault as "de-minimis in nature." Doc. 69 at 5, 16; *see also id.* at 19 ("No injuries [were] documented . . . .").

At his deposition, Plaintiff gave an elaborate story of what happened while he was lying on his bed for removal of the restraints. *See* Doc. 65-1 at 26–29 (stating that according to an unofficial FSP policy, the captain tapped Prock on the shoulder, which was a signal to make Plaintiff move by sticking a finger in his butt so the officers could then use force on him under the pretext

that he resisted; and then Prock gave Gustafson the signal to block the camera with his body so that Prock could put a finger in Plaintiff's buttocks). However, the video footage of this entire incident makes Plaintiff's story implausible.

According to the video, Plaintiff entered the cell and kneeled on his bed for removal of the restraints. *See* Videos 7, 8. When Plaintiff refused to lean his head on the wall, the female captain moved into the camera's view and continued observing and directing everyone's actions. *See* Video 8. The three officers who were already inside the cell—Posada, Prock, and Gustafson— placed Plaintiff face down on his bed while continuing to hold down his body. *See id.* With his knee on Plaintiff's ankles, Gustafson started removing Plaintiff's shackles.[14] *See id.* In the meantime, the captain was moving behind the officers and tapping them on their backs as she was giving out orders. *See id.* While Gustafson was still holding Plaintiff's legs and was somewhat blocking the camera's view, Prock was in the process of removing the chain from Plaintiff's waist. *See id.* Then, Plaintiff yelled: "What the f*** you keep putting your hand by my ass for?" *Id.* Immediately, the captain responded: "He

---

[14] Plaintiff argues that after Gustafson had already removed his shackles, Prock gave Gustafson a signal to put his leg over Plaintiff's ankles so that Gustafson would block the camera from capturing Prock's movements. Doc. 69 at 16. However, the video does not reveal any specific signal from Prock to Gustafson. *See* Video 8. Moreover, Gustafson's knee was already on Plaintiff's ankles and had been there the entire time that Plaintiff was lying face down on his bed. *See id.*

24

is not putting his hand there." *Id.* Then, several officers asked Gustafson to clear the camera's view so they could get an unobstructed view of the scene. *See id.* When Prock was finished removing the chain, the officers and the captain exited the cell in a chain pattern. *See id.*

As the video shows, the captain was tapping everyone on the back, not just Prock, while she was observing the scene and giving out orders. The officers followed procedure and everything ran smoothly until Plaintiff yelled. Notably, in that moment, Plaintiff did not accuse Prock of putting a finger in his buttocks as he alleged in his court filings. *See* Doc. 1 at 6; Doc. 69 at 19. When Plaintiff yelled: "What the f*** you keep putting your hand by my ass for?"; the captain interjected that Prock was "not putting his hand there," and that was the end of the discussion. Video 8.[15] There were no other accusations against Prock, who was still working on removing the chain from Plaintiff's waist and, understandably, his hands were near Plaintiff's waist and boxers. Therefore, to the extent Plaintiff asserts that the video footage supports his version of the facts, the Court finds this assertion to be inaccurate and

---

[15] Plaintiff's allegation that the audio recording was manipulated after the fact is implausible and unsupported.

"accept[s] the video's depiction over [Plaintiff's] account of the facts." *Logan*, 439 F. App'x at 800.

Upon review of the record, the Court finds that Defendants have presented sufficient evidence to demonstrate that there is no genuine issue of material fact with respect to Plaintiff's Eighth Amendment claims. Plaintiff has not presented evidence sufficient to demonstrate a genuine issue of material fact to defeat entry of summary judgment. The evidence Plaintiff offers is either duplicative of Defendants' exhibits, immaterial to the issues on summary judgment, conclusory, self-serving, and/or unsupported by the videos. Indeed, drawing all inferences in favor of Plaintiff "to the extent supported by the record," *Scott*, 550 U.S. at 381 n.8 (emphasis omitted), no reasonable juror could find that Plaintiff suffered a violation of his Eighth Amendment rights. *See generally Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient" (quotations and citation omitted)); *Kesinger*, 381 F.3d at 1247 (stating that "a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment"); *see also Bryant v. Rich*, 530 F.3d 1368, 1382 (11th Cir. 2008)

26

(Wilson, J., concurring in part, dissenting in part) ("A prisoner cannot defeat summary judgment by relying on sham affidavits, bare and self-serving allegations, or other evidence that is incredible as a matter of law. He must raise more than a mere scintilla of evidence in support of his position: in order to defeat summary judgment, there must be evidence on which the jury could reasonably find for the prisoner."). Accordingly, the Court will grant Defendants' Motion on the substance of Plaintiff's Eighth Amendment claims and will not address Defendants' arguments as to qualified immunity.

Accordingly, it is now

**ORDERED:**

1.     Defendants' Motion for Summary Judgment (Doc. 65) is **GRANTED**.

2.     The Clerk shall enter judgment in favor of Defendants Officer G. Smith, Sergeant D. Mitchell, and Sergeant E. Prock, and against Plaintiff Jonathan Michael Burton.

     3.     The Clerk shall terminate all pending motions and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 12th day of December, 2025.

 

 

_____

       BRIAN J. DAVIS

   United States District Judge

Jax-11 11/20
c:
Jonathan Michael Burton, #Y50899
Counsel of Record